2-14-0518, People of the State of Illinois, Plaintiff Appellee, v. Sean E. Kines, Plaintiff Appellant, argument on behalf of the defendant Appellant, Mrs. Howard Thompson, argument on behalf of the plaintiff Appellee, Ms. Thompson, Mr. Wiese, and Mr. Pauk. Good morning. And Ms. Thompson. Thank you, and may it please the Court and Counsel, The Illinois DNA Post-Conviction Testing Statute, which is 725 ILCS 5-116-3, is an important mechanism for post-conviction litigants to obtain DNA testing that may prove their innocence. It's established the innocence of numerous people in Illinois and elsewhere in this nation. And what's clear from the wording of the statute is that the legislature wanted to give people access to this testing. That's the point of it, as long as they met the requirements of 116-3, which Mr. Kynes does here. How will this testing potentially prove Mr. Kynes' innocence? In several ways, Your Honor. There's three pieces of evidence that Mr. Kynes seeks to have tested. One is the clothing of the victim that was found underneath her and around her body, where she was found in the basement of the apartment building where she was apparently killed. One is a shirt that was used as a ligature to strangle her, and that was also found around her neck when her body was found in the basement. And the third thing is semen that were found on tissues or napkins that were also found near the victim's body in the basement. There's never been anything to connect your client to the tissues, correct? That's right. And what the reported eyewitness, who was a child witness in this case, said was that he witnessed parts of an apparent assault. He describes himself as coming in and out of the room. So it's not 100 percent clear, even from his testimony, who did what. But what his testimony does say very clearly is that he witnessed my client, Mr. Kynes, strangling the victim with his ligature. And then he then witnessed my client and the other co-defendants in this case, Mr. Berry and Mr. Jordan, take the victim in a blanket to the basement area of the apartment building. And the blanket was never recovered. That's right. And you can't seek testing on something that isn't in existence in a meaningful way now. And so that's not something we're seeking testing on. So if there was no connection in the trial between your client and the tissues, then what's the relevance? The relevance is this, Your Honor. One tool that has been used to make DNA testing more meaningful is redundancy, which is clearly Mr. Kynes' argument is that he didn't do this and we don't know who does. And he doesn't know who does because he didn't witness this assault.  The ligature, the victim's clothing, which was clearly removed from her, and these tissues. And we don't know who is responsible for any of those items. Now, obviously, there was a stipulation at trial that the blood type of the tissues matched Mr. Jordan. But a blood type match, as this Court knows, is very different from a DNA match that says, with much more specificity and certainty, this is the person who left this evidence. If there are – Mr. Kynes makes two arguments about the victim's clothing and about the ligature, which is we may get a profile that can go into CODIS from those items. We may also get an unknown profile. And if there's significant amounts of an unknown profile but DNA evidence on both of those items, that points strongly to someone having done this crime that's not Mr. Kynes, that's connected to those two pieces of evidence. This is that pure speculation. We have some of these – apparently the shirt that was used as the ligature was Mr. Jordan's sister's blouse, correct? It was connected to Mr. Jordan. Okay. So let's say there's a ton of unknown DNA on that. We don't have a profile – let's say it is his sister's blouse. We don't have his sister's DNA on record anywhere. So there's a ton of unknown DNA on there. I mean, how does that help your client? It could be anybody's. It doesn't necessarily mean it's the killer's. And I understand the court's point, and that's why the issue here in part is redundancy, because if the same unknown profile is on that shirt that's also on the victim's clothing and that's also on these tissues, that says that it's not just a random person who came in contact with this shirt or owned this shirt at a prior time, but it's somebody who's connected with this crime. And what 116.3 speaks to, Your Honor, is not about what's most likely, not about what's – not about what we think is going to happen or what we suspect based on this evidence that the DNA testing is going to show. What it speaks to is scientific potential. It's very clear about that, and this court has been very clear about that, that it's not about likelihood. There's a clear path for DNA testing to show if the same person has significant amounts of DNA on the ligature, on the shirt, and potentially on the tissues as well, that's a person who had a connection to this crime that is not Mr. Kynes. And if it excludes also Mr. Berry and Mr. Jordan, then the eyewitness testimony here has problems, and that's the only piece of evidence that convicted Mr. Kynes. Does this statute open the door the way you see it for testing any piece of physical evidence in any case where the defendant has denied responsibility and identity is an issue? And there's been no testing on the items before? I mean, any piece of evidence? No, it doesn't, Your Honor, because there is a very clear requirement that the testing has to have the scientific potential to not just produce results, but results that are material to the question of actual innocence. And that's not going to be true in every case. And here it is true because of specific evidence about what, or a specific theory about what evidence was handled, what role Mr. Kynes played, but that's certainly not going to be true in every case, Your Honor. I mean, a litigant in Mr. Kynes' position has the burden to make a showing of here's what this testing could, has the scientific potential to show, and here's how that's going to relate to my innocence. And that's not going to be true in many cases, Your Honor. Well, someone else's DNA could be on it. If we have any piece of physical evidence, you know, that was handled potentially during a crime, any crime, and it could potentially have that person's, you know, another person's DNA on it, some other individual's DNA on it. I mean, again, I'm just, the trial court I think in this case mentioned, you know, whether it was speculative, whether this evidence is speculative. I mean, how does it, where's the line drawn between just pure speculation that something might be there and then this might actually, there might be probative evidence there? Well, I mean, respectfully, Your Honor, the way that this statute is drafted, it really does leave this open. I mean, it says scientific potential, not likelihood, and I agree that that's not putting us where the court normally finds itself, which is looking at what is most likely, what's most probable. This statute is not worded that way. So does it give much, does it open up testing to situations where even all of us think this isn't going to lead anywhere? Respectfully, that is what the statute says. And so it does give some of the reasons. Well, that was my initial question. I mean, does this open the door then to testing in pretty much every case where there's a piece of physical evidence? But I don't believe so, Your Honor. And part of the reason why is that some of the situations in which DNA testing is potentially not going to be granted under the statute are going to be situations where there is really no reason to think that you're going to be able to draw the assailant's profile from a particular piece of evidence or where you think or where the court believes that an unknown profile isn't going to mean anything. I mean, in situations in which there's a piece of evidence that a number of people have handled or where there's not evidence that the way that this evidence was handled by the assailant is going to necessarily leave their DNA, that's going to be a situation where maybe it's more difficult for someone to show the scientific potential of material evidence. And that's not the case here. And again, that's supported by the affidavit of Dr. Wright, who's averred that the way that someone needs to use a ligature to strangle someone is likely to leave DNA. That's not going to be true in situations where there's no evidence that the way that a particular piece of evidence has to be handled by the assailant is going to leave DNA. That is true here, but that's not going to be true in all cases. Is this the same testing that was asked for in 2002? It's not, Your Honor. And obviously that's the crux of the res judicata issue here. It's not the same for several reasons. First of all, back in 2002 when Mr. Kines originally sought this testing, and obviously this appellate court considered this issue in 2003, there was not the same capability to do touch DNA testing, YSTR testing, the kinds of very specific, very sensitive testing that's possible now. And what Mr. Kines actually asked for and the way the court interpreted his request back in 2002 and 2003 was to just be seeking to look at the hair evidence that was collected from the clothing and the ligature. And obviously what this court, not this court, but the second district said in 2003 was that showing that that hair belonged to this child eyewitness wasn't going to mean anything for Mr. Kines, and that's what the court was specifically looking at with the ligature and the clothing. As for the semen, what Mr. Kines was seeking at that time was to prove that that was not his but Clayton Jordan's, and I concede that doesn't mean anything because that's obviously what the assumption of the court was at the time. So that also wasn't something the court viewed as being material. Those are the specific issues that the court was looking at in 2003 when this court issued its Rule 23 order, and that's very different from what Mr. Kines is seeking now. It's different both because he's asking for different kinds of testing, because he's asking to take advantage of testing that has developed exponentially over the last 12 years, and because he's seeking different kinds of tests on these pieces of evidence. And we're not even talking about the hair evidence here because that's not part of his request, and the court already ruled that it didn't believe that that hair specifically was going to lead to something that was going to be material. But the issue litigated here, which would be the – we've got the same parties. We've got – the issue litigated is not the murder as such, but it is the specific testing that makes this not raise judicata? That's right, Your Honor, and the question for this court really is, if you read this court's Rule 23 order from 2003, does that answer the issues that Mr. Kines is raising now? Could you read that order and say this court determined that this particular testing is not materially relevant? And respectfully, when you read that order, the answer is no, because they're talking about hair evidence. They're talking about proving is that semen clay in Jordan's, and that's not the same questions that are before this court. You also can't really put yourself back in time and ask what that court would have done because that court was not faced with the same scientific potential that this court has in front of it now, as supported by the record here. And so that court was doing a very different analysis than this court is being asked to do today. Mr. Kines did that one on his own, didn't he? He did the original request on his own. I believe he had assistance on the appeal, but obviously at that point, the arguments have already been made by a pro se person, and that's what the appellate attorney had to argue. Now, you're asking for a different type of testing here. You're saying that sets it apart from raise judicata, but separate apart from the advances in DNA technology, couldn't the defendant have asked for DNA testing on these items back in 2002? And obviously that can potentially be part of the raise judicata test, which is not an issue the state's raised, but clearly, has he waived an argument because he could have made it in 2002 and he didn't make it today? And again, the answer is no. And the reason why is clearly Mr. Kines could have argued, well, as to the semen on the tissues, for example, he could have said there's a profile here to go into CODIS, and that could be anybody, not just Clinton Jordan, but any person, and I don't know who. And that's not a specific argument that he raised before. But what we know today is that because of the advancements in science, first of all, it's much easier to get a profile from a smaller amount of DNA, and we also know that CODIS itself has expanded significantly since 2002. There are many more profiles in CODIS, and so the chance that that would lead to an actual profile of a person is much different. The argument is obviously more clear in terms of this not being something he could have raised in 2002, 2003, when you look at the ligature and you look at the victim's clothing. And as Dr. Rex Hathaway talks about, while there was STR testing, it was a thing in 2002. It could be done, but it didn't get results on small stains, it didn't get results on touched DNA, and it didn't typically get results on handled items. Most of the testing that was done in 2002 had to do with bodily fluid tests, what we commonly think of, sex assault kits, people's saliva. That's the kind of thing that most testing in 2002 was done on. As Dr. Reich also explains, why STR testing, which is the much more sensitive DNA testing, and what Dr. Reich says is a possibility here, even if there's very small amounts of DNA ultimately that are found on either the ligature or on the victim's clothing, was not commercially available in 2002. So why STR testing, although it might have existed in a very nascent form, was not what it is today. He also explains that the original PCR analysis that you run at the outset to decide really a quantification issue, how much DNA is there, how should we analyze it, that was not being done in 2002, and that's the first step that Dr. Reich recommends, which is first to get a sense of what DNA is there, and that analysis wasn't being done in 2002. So why STR testing would only potentially exclude your client, correct? It would potentially exclude our client, but the other important thing it would do is draw a connection between DNA on the victim's clothing, DNA on the ligature, and potentially DNA on the napkins, and that's an important issue for Mr. Kynes here because, as the court has pointed out, maybe that DNA means less if there's just some DNA on these items, which the victim's body was found here in a somewhat public place, and obviously people pick up DNA on their clothing simply by living, but if there's the same DNA on both of those items, which could be established through YSTR testing, that raises material evidence of Mr. Kynes' innocence. So his argument really is as to both issues, Your Honor. When did it become apparent to the trial court, if ever, that these items had never been tested for DNA testing? If I understand the court's question, there's no evidence in the record ever that these items were subjected to DNA testing, and part of that is because in 1988, when these items were originally collected, when this crime originally occurred, that wasn't something that was done. There was blood typing analysis that was done on the napkins, but that's as much as technology allowed in 1988, and Dr. Wright does have some expertise on what types of testing, specifically, these law enforcement agencies were doing in 1988, and that's reflected in his affidavit that this was not being done at that time. But when the judge said, he said in his oral ruling, the trial court did say it had been previously tested, what testing was he referring to? I confess that I don't know, Your Honor, because from my review of this record and from the record as it exists before this court, there's no evidence that this evidence has ever been subjected to DNA testing. Right, but it was subjected to the blood analysis. I believe only the napkins that were found in the basement. There was some blood typing analysis done on that evidence, Your Honor. And there was hair analysis on the clothing, correct? Yes, Your Honor, that's true as well. So we don't really know if he meant those types of tests or any other types of tests. I think that's true, and I confess that I don't recall specifically the wording that the court's referring to, and I apologize, but I don't know what the court was referring to, but there's not some other DNA testing that's been done in this case, as far as all of the record indicates. Well, did you argue on behalf of Mr. Kimes that there had never been any DNA testing of this nature done or of any nature done on these items? I did, and that's based on my review of the record for my review of all the materials that are available. And the state has never argued either, Your Honor, that there was some prior testing done. So we should be in the analysis for purposes of 116.3 for a person who has never had testing done. All right. Thank you very much. Ms. Hoffman. Good morning, Your Honor. First, may I please have the court counsel Lisa Hoffman on behalf of the people? Your Honor, with respect, if you don't mind, I'll start with the last issue that you were discussing with respect to the trial court's ruling, which appears, and I would agree, it appears that the court may be looking at, I'll use the term conflating perhaps or confusing the subsections A-1 and B-1 of the statute of section 116-3. When he, this is, I'm sorry, the copy that I have doesn't have record size, but I know that his ruling starts at 1461 and ends at 1466 on the original ruling, and so this is similar. Well, actually, it starts at 14, it's before 1461, but it ends abruptly at 1462. And then 1466 goes into the reconsideration. It's very odd the way this transcript ends. I was wondering if the court said any more because there's nothing in the record. I looked at the e-record and there's nothing after 1462 that's attributed to the trial court on the original ruling. Well, I think that this portion that I'm going to talk about is in that original ruling, and I believe it's in the record because, and you can correct me if I do think the record ends strangely, but in any event, he says, I find that res judicata applies, and then he goes on, in addressing or considering the defendant's motion for argument that advancements in DNA technology should take us out of DNA testing, I've considered that as well. And then he goes on to say whether it would be more probative, and it does appear that the use of the probative language appears in subsection A2, which applies to evidence that has been previously tested. So to the extent that he appears to be talking about something that's previously been tested, there was never any argument or any evidence that any of this had been subjected previously to DNA testing. So I would agree with counsel that that's not in the record, and to the extent that the court used some language that appeared like, I personally think he was just talking about, he was trying to articulate the defendant's arguments that since the testing had advanced, since DNA testing had advanced since 2002, when he originally requested the testing, that that should take us out of res judicata. I think that's what he's saying. Shouldn't it? No. Res judicata is an equitable doctor. And if we're talking about someone proclaiming actual innocence, and we do have advancements in testing that may give us results, may not, counsel argues potential is the issue. I completely agree, except that, yes, if the advancements were the issue. And it's our position that the advancements in technology is a red herring here because it's not that the court said, oh, the DNA testing available in 2002 won't give us results. What the court said was DNA testing isn't going to give us any meaningful results. And that was because the ligature, the victim's clothing, the semen stained tissues, all three of which were named in that original pro se petition that Mr. Kines did in 2002. But I will say the petition was quite thorough and actually encompassed more than what this current petition that we're talking about encompassed. But that said, those three items, if we get a DNA sample off of that that shows us, you know, those pieces of clothing have been various places. They've all been in places where all the actors that we knew to be were, we knew to be involved or were alleged to be involved. They all had access to this apartment, to these places. Mr. Jordan was the owner or at least the ligature shirt in some way was connected to him. The clothing of the victim obviously was in the apartment with all the other people who were in and out. I agree with you when it comes to the clothing. I agree that you have a, I should say I agree that you have a point when it comes to the clothing. But let's talk about the tissue for a second. I mean, Cornell gave a statement, at least one of his statements. He gave many different versions of this. But one of his versions was that an unknown individual entered the apartment and took the young girl out. If in fact Jordan's DNA comes back on the tissue and only Jordan's, well then that's consistent with everything that the trial court found in the original trial. I think it was Judge Bowman actually found in the original trial. But if another individual's DNA comes back in that semen on the tissue, doesn't that certainly to some extent destroy the credibility of Cornell as to his last statement and verify it as to the earlier statements? No. First of all, I will, I'm going to start backwards and say that it is true that Cornell gave a number of different statements. He was a trial witness. His statements were he was impeached very well by counsel at trial and his statements were of course the evidence against the defendant. And those statements have been tested now by the trial court, the appellate court, the federal courts. So in any event, I think the nature of his statements has been certainly litigated. With respect to whether or not another person would impeach his statements, I suppose that his statement was that when he went with regard to what happened in the basement, that he saw Mr. Kynes, Mr. Jordan, Mr. Berry take the victim from the apartment into the basement and that he went down and saw those three people in the basement with the victim. And then he went back upstairs. So there's at no point has there been, I mean, Mr. Kynes is not convicted of the sexual assault, which was of course part of the linchpin, so to speak, about the DNA with respect to the semen in 2002, which is that if we get a hit on somebody else, how does that help Mr. Kynes with respect to the murder? And so then your question is, does it give us impeachment? Let me just stop you just for a second. Didn't Cornell say that he saw Jordan masturbating into the tissue? He did. No, he saw masturbating over the body, I think is what he said. And so I guess that to the extent that there might be semen from another person, does that impeach Cornell's testimony vis-à-vis Mr. Kynes' involvement? I would argue no, because even if for the sake of argument there was another person at some point that was, that whose semen, you know, ended up on those tissues in the basement, and so perhaps that person had some involvement with the body along with Mr. Jordan or instead of Mr. Jordan, still that isn't going to be impeachment evidence that would be sufficient to impeach Mr. Cornell's testimony such that Mr. Kynes is going to be in a position where he's got materially relevant evidence demonstrating innocence. And again, I'm completely in agreement that we don't have to show exonerating evidence at this point. But I also think that counsel talked about the scientific potential to show innocence. And I think Your Honor asked about, well, does that open the barn door? And I'd say yes, it swings open the doors, because at some point, well, what is science? And if you've got any, let's even take the redundancy as your, as a requirement here. In any case, we have more than one piece of evidence that if we can test that for DNA in a person who says I didn't do it, and we can arguably, because we will have to, because we can arguably get, maybe we would get an independent hit on both of those things that would then potentially show that somebody else was involved. I guess in this instance, whether somebody else was involved in the basement with this body bears not on whether Mr. Kynes is guilty of the murder, because it doesn't bear on the testimony of Cornell with respect to that. But Cornell, I thought, testified that he, on his various walks over to the door, saw Mr. Kynes upstairs strangling. Yes. And she had, and she also had these clothes that were now removed. Right. If you get the same DNA on all three of those, and they are not Mr. Kynes, doesn't that then support Cornell's one story that an unknown person was involved? And it wasn't, and then Mr. Kynes could argue he wasn't telling the truth, which he argued before, but he used different reasons. Now he's arguing for a different reason, that he's lying, which is much more powerful than he's a child and he was scared. Well, I still, I guess I don't know whether it would be he's lying or if it would be he was a child and he was scared and he didn't know he saw him. But in any event, I guess, I can't argue, I can't disagree that if you have three pieces of evidence that show another person, that maybe there's another person. But I think that, again, with Cornell's testimony, the one story he told about an unknown person coming in and taking the victim out of the apartment, and I don't have the record in front of me, but my recollection of that story was that it was precisely that somebody came in and took her out. So now we have this ligature that was used, and that he then says, well, I saw them using the ligature in the bedroom. And I saw them, you know, so I suppose that even then, the question is, does that tell us anything? I mean, does that really impeach his testimony sufficiently that we're going to find that? And I'm sorry, I guess I can't say that there's no situation in which somebody would find that to be compelling. But I think that the question is, is that the kind of material relevance that 116.3 is looking for? And I think that if we say that's the case, then we are going to be seeing these petitions in every case in which somebody has a piece of evidence or more than one piece of evidence in particular. And says, I didn't do it, we're going to have to be testing evidence all the time in an effort to find the unknown perpetrator who did this rather than me. And in this instance, what we have is we have testimony, we have testimony that is, you know, after, again, after the triers in fact heard this, that they, you know, it was found to be reliable evidence, even after Cornell was impeached, that is consistent with the evidence that we have, the ligature, the victim's clothes, the semen stained tissues with ostensibly, at least at the time, seminal fluid consistent with Clayton Jordan. All those things are consistent with Cornell's testimony. So I guess that to the extent that we might find DNA from another person, whomever that might be or whatever that might be, it's still not going to be materially relevant. Well, what about the fact that the statute says at this point that if it has not been subjected to testing, provided it meets the two basic requirements, it's entitled to be tested? Or if they ask for it, it can be tested. Well, I guess my argument would be it's not materially relevant, so it doesn't meet that requirement. And again, I guess if we are going to say that this evidence is materially relevant because it may show an unknown perpetrator, and if we have redundancy, we might have an unknown DNA that we can then say is an unknown perpetrator, then I think we really, then we're throwing the doors very wide open. And I don't think that's what the statute was designed for. Clearly, the statute works very well in certain instances. You know, the People v. Price is a case that the defendant cites in the brief, and in that case, it was tended to, he wanted to exclude himself from a sexual assault by using, you know, by getting testing of something that would show that his DNA wasn't in the cell muscle. That situation makes sense. This situation, I would have to argue, does not. And again, I think that, I have to come back to the rest of your comment, because I do think that that was what this court said in 2000, well, it was 2003 that the rule 23 came out from the 2002 petition, which was that this testing, not that the testing isn't sophisticated enough, or, you know, but the testing isn't going to give us anything that's going to be, that's going to undermine what the evidence is. And that's going to be relevant and give us that non-cumulative evidence that's materially relevant to the actual instance claim. Our opinion was limited to looking at the four individuals involved, wasn't it, though? I mean, it was basically, we saw it as him wanting to test the hairs to see whether they matched Cornell or himself, I believe it was, correct? Well, I am, that's true that Mr. Kynes in his petition referenced the, with respect to the seminal fluid, Mr. Jordan, and with respect to the hairs, Cornell and Mr. Jordan, I think. But at the time, he certainly could have asked, and, you know, Rester-Ducati talks about what you, what was or could have been. I think you can finish. Yes. Please. What was or could have been tested. So I do believe that at the time, and again, Mr. Kynes' petition was actually quite broad and quite detailed. And although those sound like they're antonyms, but I mean, he talked about a lot of pieces of evidence that he was detailing why and what. He didn't mention a third-party perpetrator. It appeared that he felt that, you know, he was wanting to place blame on those two people. But he certainly could have said at the time, and he didn't choose to do that. So I don't know that that bar, that gets in the way of the bar of Rester-Ducati. I just, I think, oh, and just one more thing, and then I, the council talked about how, that the court in 2003 didn't have the benefit of the advancements. You know, we can't go back in time and have the benefit of the advancements in DNA. That simply isn't what Rester-Ducati says. Because if that were the case, then any time anything advances, we'd be able to go back and do the same thing because now we've had a slight advancement. So I don't think that can certainly be the test. And the same goes for the enlargement of CODIS. Arguably, CODIS gets bigger every single day. Every time someone goes into prison and we put their DNA into the system, it gets bigger. So if we're going to use that as our gauge, then we're going to be testing all the time over and over and over because our database gets bigger. But wouldn't it be different if there had been some testing and CODIS is getting bigger and there has never been any testing as here? Well, if the court, if that, I think that it requires the court then to say that what 116.3 is saying is that everybody gets a chance to have their evidence tested. And that's not what the statute says. The statute says you may have an opportunity to get your evidence tested if you meet those two prongs and you can show that it has its non-cumulative evidence that's going to be materially relevant to your claim of actual innocence. So it isn't just that the database is bigger and you've never had, or there's a database out there and you've never had testing, so we give everybody a shot. That dramatically, that would dramatically alter the way that evidence is collected and tested and cases are worked up and investigated. I mean, that simply isn't, that's not what the statute says. So that would require, I think, the court then to say, all right, well, we think the statute says that everybody gets one shot at DNA testing. And that isn't what the statute says. If there are no further questions. Thank you. Thank you. Ms. Thompson. Thank you. I appreciate Justice Hutchinson's last point about whether or not the situation that Mr. Kines would be in had he actually received testing before. Because the statute does talk about how to address this in situations where someone's already received testing. And I think that's part of why the court addressed that language below is because we invited the court to make that comparison. Why would Mr. Kines be in a worse position as someone who's never received testing and the way that the state wants this court to analyze this, he would, than someone who previously received some testing but now wants more. At the very least, the court should be thinking about this issue and the issue of race judicata along the same lines, which is what is different today as, what is different today compared to what was addressed before. And this court can read the Rule 23 order that was entered in 2003. It is very clear as to what that court's assessing, what evidence the court is looking at to be tested, and the analysis that the court's making. And respectfully, the gloss that the state wants to put on that order just isn't there. That court is talking about hair. It's talking about why do we care if that's Clayton Jordan's DNA on those napkins. And that's not the situation here. Every single time that a court has looked at 116.3, it's interpreted it broadly. And that's true even with the amendments to 116.3 that we've seen over time. Even the recent amendments at the end of last year to open this up to people who pled guilty, to emphasize in the statute itself that you don't have to prove, that you don't have to show that the evidence would be completely exonerating. All of that history, the precedent around it shows that courts are looking at this expansively. And so when the state talks about the risk of opening the door, I think that's, when you look at the precedent behind 116.3 and the wording of it itself, that is what the statute is trying to do, is to open that door. Where it's not going to be a waste of time. That's why there's the language about materially relevant or evidence that materially supports someone's claim of innocence. And that is met here. The one last thing I wanted to add was about the testimony of the child witness, Cornell. And the state suggests that, well, if he was impeached in one aspect, he wouldn't be impeached on other pieces of his testimony. But it's not appropriate to parse his testimony that way. Clearly, if he is impeached on a significant issue, which is who was in the basement or what was happening with the victim in the basement, that raises questions about the entirety of his testimony. And the last thing I wanted to say was, the state doesn't see much merit in the redundancy issue. And the state's argument in part is that that redundancy issue would be present in every case. And this is a question that I know the court had as well. This is not that situation. Because this is a case where there are specific allegations about intimacy in the way that this crime was committed. Intimacy in the way that the victim was undressed, in the way that she was killed, in the way that her body was disposed of. And that is not true in every case. This is not a situation where this is going to open the door to people in all different kinds of cases because of the specific allegations about what happened to the victim here. Most cases, and a lot of the cases that will come before this court will be gun crimes, where there's no evidence that there was a body that was touched, where a person was handled. This case is a different one. It doesn't – deciding that Mr. Kynes is entitled to testing doesn't mean that every person is going to get one shot at testing, which is what the state suggests. That's simply not true. But Mr. Kynes, in 1988, didn't get the benefit of this testing. And we know that – I'm sorry, Your Honor. Well, I think from your perspective, the gun cases make sense. From our perspective, our current caseload here has turned dramatically from drugs to sexual – sexually violent cases. And of our criminal cases, there are probably a good third or maybe more. So I can't believe we're dramatically different than the other districts. So isn't it creating a wider – a wider opening? No, Your Honor. And part of the reason is that in your sexual assault cases that this court is seeing today, all those people will have had some DNA testing done at the time if there's evidence that was available to be tested. And so people that come here asking for additional DNA testing are all going to be looking at A2, Section 116.3. They're going to have to show that additional testing can be done using a method that was not scientifically available before that provides a reasonable likelihood of more probative results. And that's different than the scientific potential language that's later in the statute that I argue applies here. Those people already have a higher burden to reach. One thing we know about this case, in fact, is that if Mr. Kynes had been convicted of this case in 2004, like if this victim was found dead in 2004, what's the first thing that law enforcement would have done? They would have done the kind of testing that Mr. Kynes is seeking, as much as was available back at that time. And that's all Mr. Kynes is asking, is to take advantage of those developments. For all those reasons, Your Honors, we ask that you reverse the lower court's decision and remand this case back so that Mr. Kynes can have the DNA testing that he seeks. Thank you. Thank you, counsel, for argument this morning. We will take the matter under advisement. We will make a decision in due course, and we will now stand adjourned for today.